IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:11CR105 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | FINDINGS AND |
| | ) | |
| MARTHA ORALIA BELTRAN-MARINO, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Martha Oralia Beltran-Marino (Beltran-Marino) (Filing No. 22). Beltran-Marino is charged in the Indictment with a conspiracy to distribute methamphetamine (Count I) in violation of 21 U.S.C. § 846 and the possession with intent to distribute methamphetamine (Count II) in violation of 21 U.S.C. § 841(a)(1).

Beltran-Marino seeks to suppress any evidence seized and statements made following a traffic stop of her vehicle on Interstate 80 (I-80) in Seward County, Nebraska, by deputies of the Seward County Sheriff's Office (SCSO) on March 25, 2011. The court held a hearing on the motion on August 31, 2011. Beltran-Marino was present for the hearing along with her counsel, Bassel F. El-Kasaby. The United States was represented by Special Assistant U.S. Attorney Martin J. Conboy, IV. The court heard the testimony of Deputy Nathan Gortemaker (Deputy Gortemaker) and Sergeant Michael Glenn Vance (Sergeant Vance) of the SCSO and Special Agent Quinn Derrik Auten (Agent Auten) of the Drug Enforcement Agency (DEA). The court also received into evidence the following exhibits: a video from Deputy Gortemaker's patrol car (Exhibit 1); a video from Sergeant Vance's patrol car (Exhibit 2); a photograph of the front of Beltran-Marino's car (Exhibit 3); an advice of rights form in Spanish (Exhibit 4); advice of rights form in English (Exhibit 5); and a report from the SCSO (Exhibit 105). A transcript (TR.) of the hearing was filed on September 8, 2011 (Filing No. 35), at which time the motion was deemed submitted.

### FINDINGS OF FACT

On March 25, 2011, Deputy Gortemaker and Sergeant Vance were working traffic enforcement on I-80 in Seward County, Nebraska (TR. 5-6). Deputy Gortemaker, along with

Deputy Chad Smith, was observing eastbound traffic from a marked patrol car which was located in a turnaround in the median facing west near milepost 365 (TR. 5). Sergeant Vance, along with Deputy Tim Huntington (Deputy Huntington), was parked in a marked patrol car on a hill on the south side of I-80 facing east about a mile east of Deputy Gortemaker near milepost 366 (TR. 18-19). Around three o'clock p.m., Deputy Gortemaker observed an eastbound white sport utility vehicle with tinted windows and no front license plate (TR. 5). As the vehicle passed Deputy Gortemaker's stationary position, he noted the rear license plate was from Nebraska (TR. 5). The failure to display a front license was a violation of the Nebraska traffic laws. Since Deputy Gortemaker would need some time to catch up to the suspect vehicle because of the moderate traffic at the time, Deputy Gortemaker radioed ahead to Sergeant Vance alerting him to the traffic violation and to watch for the vehicle (TR. 6). Sergeant Vance received Deputy Gortemaker's call and observed a white sports utility vehicle, a Ford Expedition, pass his location and noted the absence of a front license plate (TR. 20). Sergeant Vance also noted a tow truck with activated emergency lights hooking up a disabled car on the right shoulder of the interstate (TR. 20). Sergeant Vance noticed the Ford Expedition did not merge to the left when approaching the tow truck although there was sufficient space to safely merge left, a violation of Nebraska traffic laws (TR. 21). Sergeant Vance proceeded onto the interstate to conduct a traffic stop of the Ford Expedition (TR. 21). Sergeant Vance's patrol car was equipped with a video camera, which recorded the stop (Exhibit 1).

     The Ford Expedition pulled over to the side of the interstate without incident. Sergeant Vance approached on the driver's side of the Ford Expedition and Deputy Huntington approached on the passenger's side (Exhibit 1). The driver of the Ford Expedition was Beltran-Marino (TR. 22). Beltran-Marino's four children were also in the Ford Expedition. Sergeant Vance noticed there were five air fresheners inside the Ford Expedition and several cell phones in the console area (TR. 22). Beltran-Marino appeared very nervous with her hands shaking as she handed Sergeant Vance her ID card, vehicle registration, and insurance card (TR. 22). Sergeant Vance noted the name on the registration and insurance card was not that of Beltran-Marino (TR. 23). Beltran-Marino furnished Sergeant Vance with a Mexican ID but she had no driver's license. Sergeant Vance also noted a license plate on the right front dash, which was partially obscured

(Exhibit 3; TR. 12, 20). Sergeant Vance directed Beltran-Marino to come back to the patrol car and informed her that he would be giving her a warning citation (TR. 23). In the meantime, Deputies Gortemaker and Smith arrived at the scene and parked their patrol car behind that of Sergeant Vance (TR. 6-7). Deputy Gortemaker's patrol car was equipped with a video camera and recorded the stop from that vantage point (Exhibit 2). While in the patrol car, Sergeant Vance ran computer checks on the vehicle and Beltran-Marino (TR. 23). Throughout, Beltran-Marino continued to display nervousness with hands shaking and hand wrenching (TR. 23). After negative results from the computer check, Sergeant Vance completed the warning citation and gave it to Beltran-Marino (TR. 23).

Both Sergeant Vance and Beltran-Marino got out of the patrol car and as they met in front of the patrol car, Sergeant Vance asked Beltran-Marino if he could ask her some more questions (TR. 24). Beltran-Marino said yes (TR. 24). Sergeant Vance asked various questions about contraband in the Ford Expedition, and Beltran-Marino denied any such materials were in the vehicle (TR. 24). Sergeant Vance asked Beltran-Marino if he could search the Ford Expedition, and Beltran-Marino said yes (TR. 24). Sergeant Vance told Beltran-Marino the children would have to be removed from the Ford Expedition before the officers could search (TR. 24-25). Beltran-Marino got her infant from a baby car seat in the Ford Expedition and sat in Deputy Gortemaker's patrol car while the other children sat in another deputy's patrol car which had arrived at the scene (TR. 25).

It took some time for the deputies to search the Ford Expedition (Exhibit 2). Sergeant Vance noted various tools marks on the Ford Expedition and suspected there were hidden compartments. Sergeant Vance deployed his canine, and the canine alerted to the Ford Expedition (Exhibit 1). Thereafter, the deputies found a pound of crystal methamphetamine taped to the underside of the baby car seat (TR. 25). Throughout the search procedure, Beltran-Moreno remained in Deputy Gortemaker's patrol car with her infant child and responded to various questions posed by Deputy Gortemaker (Exhibit 2). Throughout the entire search, Beltran-Moreno did not withdraw her consent for the deputies to search the Ford Expedition (Exhibit 2).

Once the methamphetamine was found, Sergeant Vance brought Beltran-Marino into his patrol car and called Agent Auten of the DEA, informed him of the circumstances, and asked him to meet them at the SCSO (TR. 24). Beltran-Marino was informed the Ford

Expedition would be towed and her other children would be driven to the SCSO by other deputies (TR. 27). On the trip back to the SCSO, Beltran-Marino was crying and stated she did not want to lose her babies (TR. 27). Sergeant Vance told her she would be interviewed by the DEA and she should be honest with them (TR. 27). Sergeant Vance did ask Beltran-Marino if this was the first time she was doing this and she said yes (TR. 27).

Upon arrival at the SCSO, Beltran-Marino and her children were placed in Sergeant Vance's office and the children were furnished with drinks and peanut butter and jelly sandwiches (TR. 29). About forty-five minutes after Beltran-Marino arrived at the SCSO, Agent Auten arrived (TR. 29). Upon arrival, Agent Auten was briefed before talking to Beltran-Marino (TR. 30-31). All of the children were taken to the front lobby area of the SCSO by a female corrections officer and provided with toys, blankets, and other items from the Ford Expedition (TR. 30). Beltran-Marino was shown what was happening with her children and then returned to Sergeant Vance's office where Agent Auten and Sergeant Vance began an interrogation session (TR. 32).

Throughout the traffic stop and interrogation at the SCSO, Beltran-Marino spoke English and appeared to understand the questions asked by the officers. Agent Auten told Beltran-Marino he was going to advise her of her rights and asked her whether she wanted to have them in Spanish or English (TR. 69; 73-74). Beltran-Marino stated she preferred Spanish (TR. 69). Agent Auten presented her with a Spanish language form containing her *Miranda* rights (TR. 70-71; Exhibit 4). The form conforms to an English version of the same rights (TR. 76; Exhibit 5). Agent Auten asked Beltran-Marino to read the rights aloud, which she did without any difficulty (TR. 71). After each section, Agent Auten asked Beltran-Marino if she understood, she stated she did and initialed the section (TR. 71; Exhibit 4). Beltran-Marino then agreed to talk with the officers without an attorney (TR. 72). Agent Auten did not threaten or promise anything to Beltran-Marino and she did not appear to be under the influence of any substance (TR. 72). The interview lasted approximately forty-five minutes (TR. 73). Beltran-Marino made various admissions of drug trafficking during the interview. During the interview, Beltran-Marino gave Agent Auten consent to search the cell phones (TR. 75).

4

## CONCLUSIONS OF LAW

### A. Traffic Stop

A law enforcement officer's observation of a traffic violation provides probable cause to stop a vehicle. *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011); **see** *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (**citing** *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)).  An officer's subjective motivations do not affect the reasonableness of a traffic stop based on the violation of the traffic laws.  *Frasher*, 632 F.3d at 453. Moreover, the stop is valid even if the police would have ignored the traffic violation but for the suspicion that greater crimes were afoot.  *Id.*  In this case both Deputy Gortemaker and Sergeant Vance observed a traffic violation for failing to properly display a front license plate on the Ford Expedition. Further, Sergeant Vance observed the Ford Expedition fail to merge to an outer lane of the interstate while approaching an emergency vehicle in the right lane. Both of these were violations of Nebraska traffic laws.  The court credits the testimony of Deputy Gortemaker and Sergeant Vance regarding the bases for the traffic stop. Accordingly, the court finds there was a valid traffic stop in this case.

### B. Investigatory Detention

Contemporaneous with a valid traffic stop, the officer may "conduct an investigation that is reasonably related in scope to the circumstances that initially justified the stop." *United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010).  In fact, a police officer may detain the occupants while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation. *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008); **see also** *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Additionally, a police officer may inquire about the driver and other occupants' destination, purpose of the trip and whether the police officer may search the vehicle.  *Bracamontes*, 614 F.3d at 816; *United States v. Gill*, 513 F.3d 836, 845 (8th Cir. 2008); *United States v. Williams*, 431 F.3d 296, 298 (8th Cir. 2005); *United States $404,905.00 in v. U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999).  In this case the detention of Beltran-Marino was of short duration while Sergeant Vance ran computer

5

checks and prepared a warning citation for the traffic violations. The detention of Beltran-Marino was not unreasonable.

### C. Consent Search

Following receipt of the citation by Beltran-Marino, she agreed to answer a few questions by Sergeant Vance. In that colloquy, Beltran-Marino consented to the search of the Ford Expedition. "While the Fourth Amendment does not permit warrantless searches, law enforcement may conduct such a search if they obtain a [motorist's] voluntary consent." *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011). The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Luken*, 560 F.3d 741, 744 (8th Cir. 2009). The government bears the burden of proving voluntary consent to search by a preponderance of evidence. *United States v. Muhlenbruch*, 634 F.3d 987, 999 (8th Cir. 2011). In this case, Beltran-Marino clearly consented to the search of the Ford Expedition and she was not threatened or coerced into providing her consent. From the totality of the circumstances, the court finds Beltran-Marino's consent to have been voluntarily given.

There is no evidence that Beltran-Marino withdrew her consent to search the Ford Expedition. While the search at the roadside was lengthy, at no time did Beltran-Marino complain or withdraw her consent. This is evident from the video from Deputy Gortemaker's in-car video camera. There was no complaint by Beltran-Marino as to the time or bother regarding the search. Even if there were, the withdrawal of consent must be an unequivocal act or statement that consent is being withdrawn. *United States v. McMullin*, 576 F.3d 810, 815 (8th Cir. 2009) (**citing** *United States v. Gray*, 369 F.3d 1024, 1026 (8th Cir. 2004)). No such withdrawal is present in this case.

### D. Beltran-Marino's Statements

In addition to her formal interview with Agent Auten at the SCSO, Beltran-Marino made various statements to Deputy Gortemaker while seated in his patrol car and waiting

for the search to finish. She also made statements to Sergeant Vance during the ride to the SCSO when she was detained after the methamphetamine was found attached to the baby car seat.

The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936). The court must look to the totality of circumstances in determining whether or not the statements were voluntary. *Mincey v. Arizona*, 437 U.S. 385 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

One of the principal factors to consider when assessing voluntariness is whether or not the defendant was in custody at the time of the statements. Failure to advise an in-custody defendant of **Miranda** rights will render inadmissible statements made by such a defendant as a result of police interrogation. "A consensual encounter does not amount to a custodial situation requiring the administration of **Miranda** warnings." *United States v. Woods*, 213 F.3d 1021, 1023 (8th Cir. 2000). However, "[a] **Miranda** warning must precede any custodial interrogation. A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999). "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom in any significant way." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990). "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thatsaphone v. Weber*, 137 F.3d 1041, 1044 (8th Cir. 1998) (**citing** *Stansbury v. California*, 511 U.S. 318, 322 (1994)). The definition of interrogation includes, "either express questioning or . . . any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the [defendant]." *United States v. Koontz*, 143 F.3d 408, 411 (8th Cir. 1998) (**citing** *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)).

The safeguards of *Miranda* do not come into play until a person's freedom of action is curtailed to a "degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). The mere fact that a person is the focus of a criminal investigation does not trigger the requirements of a *Miranda* advice by the interrogating officer. *Minnesota v. Murphy*, 465 U.S. 420, 431 (1984). Furthermore, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). **See also** *Pennsylvania v. Bruder*, 488 U.S. 9, 11 n.2 (1988); *United States v. Streifel*, 781 F.2d 953, 959 (1st Cir. 1986).

The court has considered the relevant factors in determining whether or not a suspect is in custody for the purposes of *Miranda* warnings as set forth by the Eighth Circuit in *Griffin*. The court finds Beltran-Marino was not in custody while seated in Deputy Gortemaker's patrol car while the search of the Ford Expedition was ongoing. She was not being "interrogated." Such statements should not be suppressed.

However, she was in custody and being interrogated while seated in Sergeant Vance's patrol car on the ride back to SCSO after the methamphetamine was found in the Ford Expedition. Sergeant Vance did not advise Beltran-Marino of her *Miranda* rights prior to that interrogation. Consequently, Beltran-Marino's statement to Sergeant Vance that this was her first trip carrying controlled substances should be suppressed.

The statements given to Agent Auten at the SCSO are another matter. Beltran-Marino was advised of her constitutional rights in Spanish pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). There is no evidence Beltran-Marino did not understand the advice of rights. Even though Beltran-Marino was advised of her *Miranda* rights, the court must examine the conduct of the law enforcement officials to determine whether or not there was an overreaching by law enforcement officials amounting to coercive police activity. Coercive police conduct will render a confession inadmissible. *Blackburn v. Alabama*, 361 U.S. 199 (1960). In determining whether a defendant made statements voluntarily, the court must determine if the accused was coerced or her will was overborne. *United States v. Wilson*, 787 F.2d 375, 380-81 (8th Cir. 1986). The court must consider the totality of the

circumstances including the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused. *Schneckloth*, 412 U.S. at 225-26. Coercive police pressure is a predicate to the finding that the confession is not voluntary and violates the accused's due process rights. *Connelly*, 479 U.S. at 167. However, any police questioning has coercive aspects to it simply by reason of the confrontation. The police officer is part of the law enforcement system that will cause a charge to be made against a suspect. The questioning by a police officer, while uncomfortable, is not coercive *per se*. See *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The court finds no coercive police activity in this matter and finds Beltran-Marino's statements to be voluntarily made to Agent Auten. Such statements should not be suppressed.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP** that:

Martha Oralia Beltran-Marino's motion to suppress (Filing No. 22) be granted as to any statements she made to Sergeant Vance while in Sergeant Vance's patrol car during the trip to the SCSO but otherwise denied as to the remainder of her motion to suppress.

**ADMONITION**

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 5th day of October, 2011.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.